UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ORALIA HEREDIA,

    Plaintiff,

  v.

CAROLYN COLVIN, Commissioner of
Social Security,

    Defendant.

No. 14 CV 5644

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Oralia Heredia has multiple physical and psychological impairments. She applied for Social Security Disability Insurance benefits, but her application was denied. She requested a hearing, after which an Administrative Law Judge found that she had several severe impairments. Nonetheless, the ALJ found that she could perform sedentary jobs that existed in the national economy. Accordingly, the ALJ found that Heredia was not disabled. Heredia filed this suit, contending that the ALJ's decision was not supported by substantial evidence and is contrary to law. For the reasons below, the ALJ's decision is reversed and the case is remanded to the Commissioner of Social Security.

**I.    Legal Standards**

**A.    Determination of Disability**

Under the Social Security Act, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). The Social Security Administration evaluates disability claims in five steps, considering whether the claimant:

1. is currently performing substantial gainful activity (if so, the claimant is *not* disabled);

2. has a severe impairment or combination of impairments (if not, the claimant is *not* disabled);

3. has an impairment that is equal to an impairment specifically listed in the regulations (if so, the claimant *is* disabled);

4. can perform her past relevant work (if so, the claimant is *not* disabled); and

5. can perform other work that exists in the national economy (if so, the claimant is *not* disabled).

20 C.F.R. §§ 404.1512(f); 404.1520(a)(4). To perform steps 4 and 5, the Administration determines the claimant's "residual functioning capacity," which is "what an individual can still do despite his or her limitations." *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014).

### B. Standard of Judicial Review

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g). When, as here, an ALJ's decision constitutes the final action of the Social Security Administration, the district court examines the ALJ's decision to determine whether substantial evidence supports it and whether the ALJ applied the proper legal criteria." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moon v. Colvin*,

2

763 F.3d 718, 721 (7th Cir. 2014). The district court must conduct a critical review of the evidence. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).

This standard of review is deferential, but it does not require the district court to "scour the record for supportive evidence or [search] for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a logical bridge between that evidence and the ultimate determination." *Moon*, 763 F.3d at 721. If the ALJ's decision was not supported by substantial evidence, or misapplied the law, the district court can "affirm, reverse, or modify the [] decision, with or without remanding the case for further proceedings." *Allord*, 631 F.3d at 415 (citation omitted). Of these options, remand (to allow the ALJ to address the deficiencies in the original decision) is appropriate unless "all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Id*.

## II. Analysis

The ALJ found that Heredia was not engaged in substantial gainful activity, and that she had several severe impairments (namely, urinary incontinence, migraine headaches, seizures, degenerative disc disease, degenerative joint disease, a knee impairment, Type 2 diabetes, obesity, and major depressive disorder). A.R. 17. At step three, the ALJ found that none of Heredia's impairments (alone or in combination) met any of the impairments specifically listed in the regulations. A.R. 17–24. Next, the ALJ determined Heredia's residual functioning capacity, finding that she could perform sedentary work with certain limitations on walking, lifting,

3

and the like. A.R. 24–29. Using that finding, at step four, the ALJ determined that Heredia could not perform her past jobs. A.R. 29—30. At the final step, the ALJ considered Heredia's age, education, work experience, and residual functioning capacity, and found that she could perform a significant number of jobs that existed in the national economy. A.R. 30–31. Thus, the ALJ found that Heredia was not disabled. A.R. 30–31.

Heredia contests the ALJ's decision that her urinary problems, her headaches and seizures, her psychological problems, and the combined impact of her multiple impairments, while severe, did not compromise her ability to work jobs in the national economy. The ALJ's errors, she argues, inflated her residual functioning capacity, which impacted the determination that she could adjust to other work. She also argues that she should have been found to be disabled at step three, because her headaches and seizures meet the specifically listed impairment for "nonconvulsive epilepsy."

### A.     Urinary Incontinence and Frequent Urination

Frequent urination can be disabling and therefore must be considered in determining a claimant's residual functioning capacity and ultimate disability. *Hill v. Astrue*, 295 Fed.Appx. 77, 82–83 (7th Cir. 2008); *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). Heredia testified that she needs to urinate every 10–15 minutes. A.R. 74. She explained that if she suppresses the urge to urinate, she gets bladder infections and, when she does eventually urinate, she can require up to 40 minutes to void her bladder. A.R. 74. She told the ALJ that her frequent need to

4

urinate caused problems at her past jobs because her employers did not permit frequent breaks. A.R. 74.

Although Heredia testified that her urinary problems affect her both during the day and at night, the ALJ found that her problems were limited to the night. A.R. 27. To make that finding, the ALJ relied exclusively on two medical records, one noting that Heredia was "still having urinary incontinence at night," and the other characterizing Heredia's complaints as being about "nocturia."[1] A.R. 27. The ALJ stated that "there [was] no evidence that [Heredia] had any problems with urinary incontinence during the day." A.R. 27. But there *is* such evidence (including, of course, Heredia's testimony). After a urodynamic evaluation in November 2011, Doctor Rosenzweig had the impression that Heredia had an "overactive bladder."[2] A.R. 570. A different doctor, Doctor Rodriguez, noted in December 2011 that Heredia's urinary impairment was a "chronic problem" that "occur[red] constantly." A.R. 646. A 24-hour medication was prescribed. A.R. 648. The ALJ did not mention these records, nor did he mention records noting "stress incontinence" or "urinary incontinence" generally, without specifying daytime, nighttime, or both. *E.g.*, A.R. 599, 603, 891, 1057. The ALJ was not permitted to

---

[1] *See* Mayo Clinic, "Frequent Urination," http://www.mayoclinic.org/symptoms/frequent-urination/basics/definition/sym-20050712 (visited June 17, 2015) ("Frequent urination may be a problem affecting you both day and night, or you may find that you need to urinate frequently only during the night (nocturia).").

[2] *See* Mayo Clinic, "Overactive Bladder," http://www.mayoclinic.org/diseases-conditions/overactive-bladder/basics/definition/con-20027632 (visited June 17, 2015) ("Overactive bladder is a problem with bladder-storage function that causes a sudden urge to urinate. The urge may be difficult to stop, and overactive bladder may lead to the involuntary loss of urine (incontinence).").

5

"analyze only the evidence supporting [his] ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (citations omitted). Instead, he was required to "confront the evidence that [did] not support [his] conclusion and explain why that evidence was rejected." *Id.* (citation omitted). He failed to do so.[3]

Frequent urges to urinate would, at a minimum, require breaks at work, and breaks must be considered when determining a claimant's residual functioning capacity. *See, e.g.*, *Moore*, 743 F.3d at 1127 ("The ALJ's decision did not reflect any likelihood of absences or breaks at work related to migraines, and that is simply unsupported by the record."). Indeed, in this case, the vocational expert testified that if Heredia needed bathroom breaks as frequently as she claimed, no full-time jobs would be available to her. A.R. 91–93. In *Durr-Irving v. Colvin*, the ALJ failed "to adequately consider the disabling effect of [the claimant's] urinary incontinence" and the vocational expert testified that "a person who needs a bathroom break every half hour" could not sustain full-time work. *Durr-Irving v. Colvin*, 600 Fed.Appx. 998, 1003 (7th Cir. 2015). The Seventh Circuit remanded, directing the ALJ to consider the claimant's urinary incontinence, both alone and in combination with

---

[3] In her brief, the Commissioner suggests that the ALJ could have discredited Heredia's testimony if the ALJ believed that someone who needed to urinate every 10–15 minutes would catheterize (which Heredia does not do). [18] at 10. "But this reasoning is nowhere in the ALJ's decision, and the Commissioner, by otherwise speculating about the ALJ's thinking, yet again violates [the] doctrine of *SEC v. Chenery Corp.*," which limits judicial review to the grounds identified in the agency's decision. *Durr-Irving v. Colvin*, 600 Fed.Appx. 998, 1003 (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943); *Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014) (collecting cases)).

6

her other ailments. *Id.* at 998, 1004; *see also Parker v. Astrue*, 597 F.3d 920, 923 (7th Cir. 2010). The similar circumstances here warrant a similar disposition.

### B. Headaches and Seizures

Heredia suffers from seizures and headaches, potentially caused by a tapeworm infection called neurocysticercosis.[4] A.R. 414, 416, 471, 474, 560, 564, 629. During a seizure, Heredia's face becomes numb and her lips shake; she does not lose consciousness. A.R. 260, 262–63. Afterward, she feels tired and needs to rest. A.R. 260–62.[5] Heredia argued that she should be found disabled on account of her seizures because they "met or equaled" the specific criteria for "nonconvulsive epilepsy" in the pertinent regulations. *See* 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. § 404, Appendix 1, listing 11.03. But to meet or equal that criteria her seizures needed to occur "more frequently than once weekly in spite of at least 3 months of prescribed treatment." 20 C.F.R. § 404, Appendix 1, listing 11.03. The ALJ's finding to the contrary (A.R. 20) was supported by substantial evidence: Heredia, her son,

---

[4] *See* Mayo Clinic, "Tapeworm Infection," http://www.mayoclinic.org/diseases-conditions/tapeworm/basics/complications/con-20025898 (visited June 17, 2015) ("**Brain and central nervous system impairment**. Called neurocysticercosis (noor-o-sis-tih-sur-KOE-sis), this especially dangerous complication of invasive pork tapeworm infection can result in headaches and visual impairment, as well as seizures, meningitis, hydrocephalus or dementia. Death can occur in severe cases of infection.").

[5] A.R. 260 is a "seizure description form" completed by Heredia's mother. The ALJ gave this "no weight" because he thought it reported a "much more severe seizure pattern" than the other evidence, including Heredia's own testimony. A.R. 29. The ALJ's finding is at least partially incorrect. He wrote that Heredia's mother reported loss of consciousness during seizures (A.R. 29), but she actually reported *no* loss of consciousness (A.R. 260). The description of Heredia's seizures—shaking lips, facial numbness, and tiredness afterward—is consistent across the evidence. Heredia makes reasonable arguments that her mother's description of the frequency of seizures and occasional loss of bladder control was also consistent with other evidence. [14] at 24–25. On remand, the ALJ should consider whether some weight should be given to Heredia's mother's seizure description form.

and her brother-in-law all described her seizures (once she was on her medication) as less frequent than once weekly. A.R. 73–74, 261–63.

Still, Heredia's seizures must be taken into account in determining her residual functioning capacity. *Murphy*, 759 F.3d at 817. Heredia testified that, at the time of the hearing and while on medication, she experienced seizures about twice per month. A.R. 73–74. Her son and brother-in-law described the frequency as "more than once per month." A.R. 261–62. The ALJ did not make a specific finding as to how often Heredia's seizures occur, but he did not believe they occurred as often as twice per month. A.R. 27. The ALJ found it "interesting[]" that no doctor had directed Heredia to stop driving. A.R. 27. (He didn't mention that her doctor *had* told her to be careful while driving. A.R. 76–77.). He opined that "[i]f [Heredia] was having seizures as frequently as twice a month and if she told a treating physician, it is reasonable to assume that a physician would medically restrict her from driving until she was seizure free for a set amount of time." A.R. 27. Given that Heredia's symptoms do not include loss of consciousness, the ALJ's opinion—that a doctor would necessarily restrict Heredia's driving—is not beyond question. More importantly, it was *the ALJ's* opinion—he did not ask the medical expert to opine on Heredia's ability to drive. By speculating that, if Heredia suffered from seizures as frequently as she claimed, a doctor would have directed her to stop driving, the ALJ impermissibly "played doctor." *See Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (rejecting ALJ's interpretation of MRI results); *Moon*, 763 F.3d

8

at 722 (ALJs must "rely on expert opinions instead of determining the significance of particular medical findings themselves.").

The only other reason the ALJ gave for rejecting Heredia's testimony was that it "exceeded the objective medical evidence." A.R. 27. Rejecting testimony on that ground is erroneous. *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015); *Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015); *Moore*, 743 F.3d at 1125; SSR 96-7p(4), http://www.ssa.gov/OP_Home/rulings/di/01/SSR96-07-di-01.html (visited June 17, 2015) ("An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."). Because the ALJ rejected Heredia's testimony without proper grounds, remand is necessary. *Engstrand v. Colvin*, — F.3d —, 2015 U.S. App. LEXIS 9333, *12 (7th Cir. June 4, 2015) (ALJs "must competently explain an adverse-credibility finding with specific reasons supported by the record. An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding.") (marks and citations omitted).

Concerning headaches, the ALJ noted that there is no specific regulatory listing for headaches. A.R. 21. Still, the ALJ was required to identify any limitations that the headaches, in combination with Heredia's other impairments, would cause. *Moore*, 743 F.3d at 1125; *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014) ("The fact that the headaches standing alone were not disabling is not grounds for the ALJ to

9

ignore them entirely—it is their impact in combination with Yurt's other impairments that may be critical to his claim."); *id.* ("Although this omission standing alone probably would not have been grounds for remand, the ALJ may clarify on remand the effect of Yurt's tension headaches on his claim."). Heredia testified that she experienced a headache every day. A.R. 26. There is some evidence to that effect. (For example, in August 2012 her doctor noted that she complained of daily headaches that were so severe that she feared she would pass out. A.R. 938.) On remand, the ALJ must determine the frequency and severity of Heredia's seizures and headaches, and account for these in determining her residual functioning capacity.

### C. Psychological Impairments

Heredia suffers from psychological problems, potentially the result of being raped and beaten by her father when she was a child (and from not being able to protect her 5-year-old sister, who was also raped by their father; and from witnessing her father beat her mother). A.R. 592, 625–26, 628. In 2003, Heredia had suicidal thoughts and expressed suicidal statements; as a result, she was hospitalized. A.R. 522, 591, 626.

A psychological expert testified at Heredia's hearing. A.R. 62–69. The ALJ adopted the psychological expert's opinion, finding that it "adequately reflected the evidence that was available for the expert to review and was not contradicted by evidence received at the hearing." A.R. 29. But the psychological expert himself recognized that he did not have all of the relevant records: he testified that certain

10

missing records were "essential" and could show a more severe level of impairment than the records he reviewed. A.R. 64, 67.

At and after the hearing, additional records were submitted to the ALJ. These records reflect ongoing psychological problems and, importantly, a new diagnosis of borderline personality disorder (in combination with major depressive disorder). A.R. 1054, 1061, 1067, 1074, 1081. No expert considered the diagnosis of borderline personality disorder, or the impact of that disorder combined with major depressive disorder, so the ALJ was without a medical foundation on those issues. That is problematic because the combination can be disabling. *See Phillips v. Astrue*, 413 Fed.Appx. 878 (7th Cir. 2010).[6] The ALJ reviewed the records himself and—without discussing their contents or the diagnosis of borderline personality disorder—opined that they did not change the outcome. A.R. 23. That was a mistake. *Harlin v. Astrue*, 424 Fed.Appx. 564, 568 (7th Cir. 2011) ("To the extent that the ALJ projected how Dr. Rozenfeld[] would have testified had she seen the additional documents, the ALJ improperly assumed the role of doctor.") (citing *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010); *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006)); *see also Moore*, 743 F.3d at 1121 ("A decision that lacks adequate discussion of the issues will be remanded."). On remand, the ALJ should

---

[6] Another similarity between this case and *Phillips* is that the claimant's psychological impairments were arguably connected to childhood sexual abuse at the hands of her father. In *Phillips*, the Seventh Circuit noted (disapprovingly) that the history of abuse was nowhere mentioned in the ALJ's opinion. 413 Fed.Appx. at 883. On remand, the ALJ should consider the history of abuse suffered by Heredia.

consider all of Heredia's psychological impairments and diagnoses, alone and in combination.

### D. Combined Impact of Impairments

On remand, the ALJ must consider the combined impact of Heredia's multiple impairments, including those that on their own would not be considered severe. *Yurt*, 758 F.3d at 860; *Golembiewski*, 322 F.3d at 918.[7] The combined impact must be used to determine her residual functioning capacity; then, the reconsidered residual functioning capacity must be used in the step-five determination of whether she can perform work that exists in the national economy.

---

[7] In particular, there is evidence that several of Heredia's impairments require her to take breaks, perhaps frequently. A.R. 70, 74, 260–62, 744. The vocational expert testified that the frequency of a claimant's required breaks affects her employability. A.R. 91–93. Heredia's need for breaks must be based on all her impairments in combination.

12

## III. Conclusion

The ALJ's assessment of Heredia's incontinence and its impact on her residual functioning capacity was not supported by substantial evidence. In addition, the ALJ did not properly consider the combined effect of Heredia's headaches, seizures, and psychological impairments when evaluating her ability to work in the national economy. The decision did not build the necessary "logical bridge" between the evidence and the disability determination. But a finding of disability is not the only conclusion that could be drawn from the record, and therefore, the ALJ's decision is reversed and the case is remanded to the Commissioner of Social Security.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: 6/18/15